Joseph A. **TRUGLIA**, Plaintiff,

v.

**KFC CORPORATION and Pepsico Corporation, Defendants.**

**No. 88 Civ. 1331 (GLG).**

United States District Court,
S.D. New York.

Aug. 10, 1988.

Steven H. Gaines, White Plains, N.Y., for plaintiff.

Clark, Gagliardi & Miller, P.C., White Plains, N.Y., for defendants; Lawrence T. D'Aloise, Jr., of counsel.

## OPINION

GOETTEL, District Judge.

The plaintiff, Joseph Truglia, a citizen of New York, operates two Kentucky Fried Chicken franchises. The first franchise is located in White Plains, New York and the second in Elmsford, New York. Defendant KFC Corporation ("KFC") is incorporated in Delaware [1] and is a wholly-owned subsidiary of Frito–Lay, Inc. Frito–Lay is not a defendant in this suit. However, Frito–Lay's parent corporation, Pepsico, Inc. ("Pepsico") is a defendant in this suit.[2] Pepsico is incorporated in North Carolina and has its principal place of business in Purchase, New York.

Each of these parties has brought one or several motions. There is, first, a motion by Pepsico to dismiss pursuant to Fed.R. Civ.P. 12(b)(6) or for summary judgment pursuant to Fed.R.Civ.P. 56. We have treated the plaintiff's opposition to this motion as a motion to remand. KFC has moved to dismiss pursuant to Rule 12(b)(6) or for summary judgment. KFC has also moved for a preliminary injunction enforc-

---

1. The parties have not indicated where KFC maintains its principal place of business.

2. The complaint alleges that Pepsico purchased KFC in the summer of 1986. Given that Pepsico is not the direct parent of KFC, but rather the parent of KFC's parent, this allegation is not entirely clear. We cannot say whether Pepsico then owned Frito–Lay and Frito–Lay purchased KFC, or whether Pepsico purchased Frito–Lay and thereby became the parent of KFC.

ing the provisions of the franchise termination agreement between it and the plaintiff. Also before us is the plaintiff's motion for a preliminary injunction preventing the defendants from terminating his franchises.

By order dated April 8, 1988, we granted defendant Pepsico's motion to dismiss, and consequently denied the plaintiff's motion to remand since diversity jurisdiction existed between the remaining parties. By the same order, we denied the plaintiff's motion for a preliminary injunction, and denied KFC's motion for a preliminary injunction to the extent it sought to prevent the plaintiff from engaging in the fried chicken business within a ten-mile radius of his present locations. We reserved judgment as to the remaining portions of KFC's motion for a preliminary injunction, and as to its motion to dismiss or for summary judgment.

In this opinion we present the analysis underlying the decisions contained in our order and address the outstanding elements of KFC's motions. With respect to the latter, for the reasons enunciated below we deny, in its entirety, KFC's motion for a preliminary injunction. We grant KFC's motion for summary judgment only with respect to plaintiff's White Plains franchise. With respect to the Elmsford outlet, we deny its motion for summary judgment.

## BACKGROUND

On January 6, 1984, by assignment from a prior franchisee, the plaintiff acquired operation of the Kentucky Fried Chicken franchise in White Plains, New York. The Franchise Agreement assumed by the plaintiff requires the plaintiff to operate his franchise within certain guidelines prescribed by KFC.[3] Of particular relevance here is the requirement that the plaintiff make monthly royalty payments to KFC and that he execute an Advertising Agreement with KFC National Cooperative Ad-

vertising Program, Inc. ("KFC Cooperative").[4] Royalty payments are due the twentieth of the month subsequent to that for which they accrue. The Franchise Agreement provides that KFC will give the franchisee notice of default in the event of default or breach, and thereafter, give the franchisee thirty days to remedy the breach or default. If the franchisee is repeatedly in default or breach, KFC can reduce the period in which to cure to ten days. Section 8.3 of the Franchise Agreement states that "each failure to pay royalties *when due* will be a material breach." (emphasis added)

The plaintiff's association with KFC has not been a happy one. Evidence proffered by KFC indicates that the plaintiff has been frequently, if not chronically, late in paying royalties to KFC. The plaintiff accepts this, but suggests that late payments were customary among franchisees, and at least in the plaintiff's case, acquiesced in by KFC. Evidence also suggests that the plaintiff was in other respects deficient in the operation of his franchise. Specifically, KFC alleges the plaintiff was late in making payments to the KFC Cooperative and operated the White Plains outlet in an "unclean" manner.

In 1985, the plaintiff sought to obtain an additional franchise in Elmsford, New York. Initially, KFC rejected his application because, at that time, he was in default on his obligation to make royalty payments for the White Plains outlet. In the fall of 1986, KFC reconsidered its decision and conditionally granted the plaintiff the Elmsford franchise. In consideration for the Elmsford franchise the plaintiff signed a Termination Agreement. Under its terms the plaintiff agreed that if he defaulted on "any obligation" under the Franchise Agreement, and if he failed to cure the default within the specified period, as controlled by the Franchise Agreement, then the Franchise Agreement would auto-

---

**3.** These guidelines, all contained within the Franchise Agreement, are admittedly extensive and govern all phases of the franchisee's business operations, including opening hours, food standards and decor. The franchisee is also required to permit access to KFC representa-

tives in order to inspect the outlet and its facilities.

**4.** See the Franchise Agreement paragraphs 8.1 to 8.3, and paragraphs 10.1 to 10.5.

matically terminate.[5]  Upon termination, the plaintiff would be obligated not only to cease operations as a Kentucky Fried Chicken outlet, but also to cease selling fried chicken within a ten-mile radius of his present franchise.  As noted, the specified period in which to cure was thirty days from receipt of a notice of default, unless the plaintiff repeatedly defaulted, in which case the grace period could be shortened to ten days.  These conditions are described in the Termination Agreement which the plaintiff signed on December 16, 1986.  The Elmsford store opened on August 27, 1987.

Despite the Termination Agreement, the plaintiff continued in his ways and repeatedly failed to make royalty payments for the White Plains store.  KFC sent default notices to the plaintiff for January, February, April, May, June, July, and August of 1987.  In all months but July the plaintiff cured his default within thirty days of receiving a notice of default.  This action arises from the plaintiff's failure to cure his default for July 1987.

KFC notified the plaintiff, by letter dated September 16, 1987, of his default of his July obligations for the White Plains store.  KFC's letter, which the plaintiff acknowledges receiving on September 22, 1987, also reduced, as per paragraph 17.3 of the Franchise Agreement, plaintiff's time to cure from thirty to ten days.  On the next day, September 23, the plaintiff sent KFC his July royalty check.  This check was returned for insufficient funds.  By letter dated October 22, 1987, KFC notified the plaintiff that it was exercising its rights under the Termination Agreement and declared the Franchise Agreement for the White Plains store terminated.

In November 1987, KFC and the plaintiff executed an amendment to the Termination Agreement, whereby they extended the effective date of termination until February 20, 1988.  (The amendment refers to both the White Plains and Elmsford stores, although the default and termination notices had referred only to the White Plains store.)  The stated purpose of the amendment was to give the plaintiff time in which to sell his two franchises.[6]  On February 19, 1988, one day before the (extended) date of termination, the plaintiff instituted an action in New York state court and obtained an order temporarily restraining KFC's execution of the Termination Agreement.  The defendants subsequently removed the case to this court.  After removal, the plaintiff filed his complaint.  Both the Franchise Agreement and the Termination Agreement provide that all contractual disputes will be interpreted in accordance with Kentucky law.

## DISCUSSION

### A.  Defendant Pepsico's Motion to Dismiss and the Plaintiff's Motion to Remand

We have treated the plaintiff's opposition to Pepsico's motion pursuant to either Rule 12(b)(6) or Rule 56 as a motion to remand.  This case was removed to this court on the basis of diversity jurisdiction.  However, both the plaintiff and Pepsico reside in New York.  If Pepsico is properly named as a defendant, then diversity jurisdiction would be defeated and the case must be remanded.

The joinder of a defendant who resides in the state where an action is brought will not defeat diversity jurisdiction if the resident defendant has no real connection to the action.  *Allied Programs Corp. v. Puritan Insurance Co.*, 592 F.Supp. 1274, 1276 (S.D.N.Y.1984).  The test for determining whether a plaintiff has improperly joined a resident defendant has been stated in various ways.  Basically, the

---

**5.**  The parties differ as to whether a default relating to one store terminates both franchises or only the franchise to which the default applies.

**6.**  KFC itself offered to buy the stores.  However, before it could set an offering price, KFC needed to see the financial statements for each outlet, and requested them of the plaintiff.  Despite prodding from counsel, the plaintiff never provided the necessary information, and therefore, KFC withdrew its offer.  KFC also alleges that the plaintiff never permitted it to inspect the stores, which KFC also required before it would purchase them.

defendant must show with specificity that the facts as stated in the complaint, under the present law of the forum state, form no basis for recovery against the defendant who defeats diversity. *Parks v. New York Times Co.*, 308 F.2d 474, 478 (5th Cir.1962), *cert. denied*, 376 U.S. 949, 84 S.Ct. 964, 11 L.Ed.2d 969 (1964); *American Mutual Liability Ins. Co. v. Flintkote Co.*, 565 F.Supp. 843, 845 (S.D.N.Y.1983). In applying this test the court should resolve all disputed questions of fact in favor of the plaintiff. *American Mutual* at 845. Similarly, any doubt as to the state of controlling law should be resolved in the plaintiff's favor. *Id.* The burden of proving the right to a federal forum falls squarely on the party seeking removal. *R.G. Barry Corp. v. Mushroom Makers, Inc.*, 612 F.2d 651, 655 (2d Cir.1979). Thus, in this case, the defendants must show that the plaintiff's allegations, taken in the light most favorable to him, cannot establish any liability on the part of Pepsico.

■ The plaintiff alleges that Pepsico controlled the policies of KFC, and that Pepsico changed those policies to his detriment. The nature of these policies, how Pepsico changed them, and how these changes specifically harmed the plaintiff are left unexplained by the plaintiff. Under New York law a parent must completely dominate and control its subsidiary before the corporate veil can be pierced. *See Fidenas AG v. Honeywell Inc.*, 501 F.Supp. 1029 (S.D.N.Y.1980) (summarizing the relevant considerations). The mere assertion that a corporate parent is or was involved in the decision-making process of its subsidiary, or that it controlled the legitimate policies of its subsidiary, will not shift liabilities among distinct corporate entities. *Allied Programs Corp. v. Puritan Insurance Co.*, 592 F.Supp. 1274, 1277 (S.D.N.Y.1984) (citing *Musman v. Modern Deb. Inc.*, 50 A.D.2d 761, 377 N.Y.S.2d 17 (1975)). The plaintiff has not alleged any facts to suggest that the corporate form should be disregarded in this case. We therefore grant defendant Pepsico's motion to dismiss. We do, however, grant the plaintiff leave to replead if a viable cause of action against Pepsico can be properly and fully pleaded.

With the dismissal of Pepsico, there is now complete diversity among the remaining parties, and we therefore deny the plaintiff's motion to remand.

### B. KFC's Motion to Dismiss or for Summary Judgment

#### 1. KFC's Motion to Dismiss

■ In assessing a motion to dismiss for failure to state a claim upon which relief can be granted, Fed.R.Civ.P. 12(b)(6), this court must follow the standards set forth in *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957):

> a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Id.* at 45–46, 78 S.Ct. at 102. The complaint must be viewed in a manner most favorable to the plaintiff and all factual allegations must be accepted as true. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Moreover, all reasonable inferences which can be drawn from the facts alleged must be construed in the plaintiff's favor. *E.g., Murray v. City of Milford, Connecticut*, 380 F.2d 468, 470 (2d Cir.1967).

Turning to the specifics of this case, the plaintiff has alleged that he entered into two franchise agreements with KFC—one governing operations at the White Plains outlet and another governing operations at the Elmsford outlet. Subsequently, in December 1986, the plaintiff allegedly was coerced into signing the Termination Agreement. He further alleges that in October 1987 and in January 1988 KFC breached the franchise agreements when under Pepsico's direction, they terminated his franchise "in contravention" of those agreements. It is the plaintiff's contention that he substantially performed all the terms and conditions of the franchise agreement.

Accepting the plaintiff's allegations as true, he has sufficiently pleaded a cause of action for breach of contract, and we there-

fore deny the defendant's motion to dismiss.

## 2. KFC's Motion for Summary Judgment

The standards governing summary judgment are easily digested. Fed.R.Civ.P. 56(c) provides that summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510–10, 91 L.Ed.2d 202 (1986) (noting, *inter alia*, that "the substantive law will identify which facts are material"). The burden is on the moving party to demonstrate the absence of a material factual dispute. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); Fed.R.Civ.P. 56(e). Consistent with *Adickes*, the Second Circuit has held that "the mere existence of factual issues— where those issues are not material to claims before the court—will not suffice to defeat a motion for summary judgment." *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 11–12 (2d Cir.1986) (quoting *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985) (per curiam)), *cert. denied,* — U.S. —, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

If this initial burden is met, the non-moving party, here the plaintiff, cannot rest on its complaint, *First Nat'l Bank of Arizona v. Cities Services Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968), but "must set forth specific facts showing that there is a genuine issue for trial." Fed.R. Civ.P. 56(e); *see, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). This showing must establish more than merely "some metaphysical doubt as to [those] material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). However, in deciding if this burden of coming forward has been met, the court must draw all reasonable inferences in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam).

### (a) *The White Plains Outlet*

The Termination Agreement supersedes all prior agreements between the plaintiff and KFC. It states quite clearly that the failure to fulfill any franchise obligation constitutes a breach of the Termination Agreement, and that upon the franchisee's further failure to cure after notice of default, the Franchise Agreement automatically terminates.

As we indicated above, the plaintiff failed to tender his July 1987 royalty payment for the White Plains franchise, and KFC sent him a notice of default which he received on September 22, 1987. The plaintiff does not contest that KFC was entitled to reduce its grace period to ten days, nor that this period expired on October 2, 1987. This latter date had long passed by the time KFC received any check from the plaintiff backed by sufficient funds. Even the longer, thirty-day grace period passed without any sight of the past-due July royalties. Therefore, by operation of the Termination Agreement the White Plains franchise terminated, at the latest, by October 22, 1987.

Despite this clear progression of events and consequences, the plaintiff makes several arguments against our granting summary judgment to KFC. These arguments, simply put, fly on a wing and a prayer. However, given the serious consequences which flow from the termination of his franchise, we will address each of them.

■ The plaintiff alleges that his lateness in tendering his payment did not materially breach the White Plains franchise agreement. He argues that, under Kentucky law, lateness of payment does not constitute a breach sufficiently material to warrant termination. The plaintiff is correct that the law of contract draws a distinction between an absolute failure to perform and a failure to timely perform. 11 S. Williston, *A Treatise On The Law Of Contracts* § 1290 (3d ed. 1968). However here, the plaintiff's July payment was beyond being simply late. He failed to tender payment as required, and thereafter, failed to cure upon receiving a notice of default until well after the grace period had ex-

pired. This degree of lateness indicates a material breach, and not merely a "technical default" as the plaintiff claims. *Id.* *See, e.g., McDonald's Corporation v. Robert A. Makin, Inc.,* 653 F.Supp. 401 (W.D. N.Y.1986) (failure to make monthly payments as required under a franchise agreement constitutes a material breach warranting termination of the franchise); *see also West Kentucky Coal v. J.D. Nourse,* 320 S.W.2d 311 (Ky.App.1959) (holding plaintiff's failure to deliver drilling data as required violated fundamental contract principle, namely, that before a party can obtain the benefits of a contract, they must perform the obligations imposed upon them).

■ The plaintiff next points to other franchisees' lateness in making royalty payments, and claims that KFC has accepted this lateness without complaint. Therefore, the plaintiff argues, KFC should not be heard to complain about his own lateness. In effect, the plaintiff is making a sort of "course of dealings" or "trade practices" argument. Neither concept properly fits the situation presented here, and in any event, neither would apply. Whatever KFC's practices in the past, with this or any other franchisee, the rules of the game vis-a-vis the plaintiff were changed by the Termination Agreement.

The plaintiff next argues that Pepsico controlled the policies of KFC in a manner detrimental to the plaintiff's business interests. He further alleges that since Pepsico controlled KFC's policies, KFC's motives for terminating his franchise were somehow impure and improper. Since we have already dismissed Pepsico as a defendant this argument is moot. However, giving the plaintiff maximum leeway, the point is nevertheless specious. Pepsico is the "grandfather" corporation to KFC. The plaintiff never alleges how Pepsico allegedly controlled the corporate policy and daily decisions of KFC, nor does he allege, much less prove, in what way KFC's motives were improper. Moreover, KFC has demonstrated that it acted within its rights under the Termination Agreement. As noted above, on a motion for summary judgment, when faced with such a showing, the plaintiff cannot rest on his complaint, but must set forth genuine issues for trial. Fed.R.Civ.P. 56(e). *See, e.g., First Nat'l Bank,* 391 U.S. at 289, 88 S.Ct. at 1592. Hence, the plaintiff's conclusory allegations in his complaint are insufficient to withstand KFC's motion for summary judgment.

The plaintiff further argues against summary judgment on the theory that his check in payment of his August royalty obligation can be, and should have been, applied against his outstanding July obligation. Whether or not KFC was required to apply plaintiff's August check against his July obligation is not really germane. The plaintiff acknowledges that the check in payment of his August obligation was dated October 8, 1987. This date was six days beyond the ten-day grace period. Moreover, KFC points out that it did not receive the August payment until October 27, 1987, which date is past even the thirty-day grace period. In effect, the plaintiff admits his breach, but offers up a less egregious version for our consumption.

■ The plaintiff also alleges he signed the Termination Agreement without the benefit of legal counsel and suggests this in itself invalidates the Termination Agreement. However, as before, the plaintiff offers no evidence, only bald allegations to rebut KFC's showing that the plaintiff signed the Termination Agreement with at least the knowledge, if not the advice, of counsel. Admittedly, the plaintiff signed the Termination Agreement without the presence of counsel, but this alone does not suggest he signed it without the knowledge and advice of counsel.

■ Finally, the plaintiff alleges he was coerced into signing the Termination Agreement. He bases his claim on a sort of "economic duress" argument. In short, he contends he had no choice but to sign the Termination Agreement or lose his option to acquire the Elmsford franchise. He bolsters his point by alleging that he already had made a considerable investment in the Elmsford franchise. Although unclear, the record suggests this investment

consisted of "start-up" costs, presumably in real estate, building construction and fixtures. The weaknesses of this argument are readily apparent.

To assert a claim for economic duress the party alleging duress must show that he was a victim of a wrongful or illegal act or threat and that this act or threat deprived him of his free will. 13 S. Williston, *A Treatise On The Law Of Contracts* § 1617 (3d ed. 1968). It is quite clear that "[i]f the payment or exchange is made with the hope of obtaining a gain, there is no duress." *Id.* Thus, the mere fact that one stands to lose a profit opportunity is not, without more, the type of duress which will invalidate a contract.

■ The plaintiff, however, intimates that his option to acquire another franchise was not merely an opportunity, but a valuable vested right that he held pursuant to the Franchise Agreement, a right which he stood to lose unless he signed the Termination Agreement. Nothing could be farther from the truth. The Franchise Agreement clearly states that a franchisee's option to acquire another franchise is conditioned upon several factors, including the franchisee's past payment record with KFC. Given the plaintiff's notably poor payment history, it seems beyond question that KFC was within its rights to deny the plaintiff the Elmsford option, or to condition its approval on his acceptance of reasonable conditions.

As to the plaintiff's point that he was in a poor bargaining position because he invested heavily in the Elmsford location before he acquired the franchise, that problem was of his own making. A claim for economic duress will not lie if the party making the claim was constrained to enter into the transaction as a result of his own doing. 13 S. Williston, *A Treatise On The Law Of Contracts* § 1608 (3d ed. 1968). If this were not clear enough, KFC's letter extending the option to the plaintiff cautioned the plaintiff not to obligate himself to any real estate or purchases until he received a "countersigned copy of the franchise option agreement and written acceptance of the site." The plaintiff chose to ignore this cautionary warning and to place himself in his present predicament.

(b) *The Elmsford Outlet*

■ It is unclear whether under the Termination Agreement a default as to one franchise effectuates the termination of only that franchise or of both franchises. The significance of this ambiguity lies in the fact that the default at issue here pertains to only the plaintiff's obligations for one franchise—the White Plains outlet. Moreover, the default notice at issue spoke only to the White Plains franchise. In other words, it is an issue whether, under the Termination Agreement, the plaintiff's default with respect to his White Plains franchise effectuates the termination of not only that franchise, but also his Elmsford franchise.

Because the proper construction of the Termination Agreement implicates such issues as the parties' intent, we decline to grant summary judgment to KFC as to the Elmsford franchise.

C. *KFC's Motion for a Preliminary Injunction*

■ We turn finally to KFC's motion for a preliminary injunction. To the extent KFC seeks a preliminary injunction during the pendency of this suit, its motion has been rendered partially moot by our entering summary judgment in its favor with respect to the White Plains store.

To the extent KFC also seeks a preliminary injunction against the plaintiff's continued operation of the Elmsford franchise, we cannot decide this on the basis of the present record. As noted, there are several outstanding issues of fact to be resolved with respect to the Elmsford franchise. Consequently, KFC's motion of a preliminary injunction cannot be decided prior to an evidentiary hearing. We will schedule such a hearing upon the request of either party.

D. *Plaintiff's Motion for a Preliminary Injunction*

A preliminary injunction is an extraordinary equitable remedy which should be

granted sparingly. It is inappropriate if damages can be calculated with reasonable accuracy and a monetary award would provide adequate compensation for the claimed harm. *Loveridge v. Pendleton Woolen Mills, Inc.*, 788 F.2d 914, 918 (2d Cir.1986). To prevail on a motion for a preliminary injunction, the movant must show:

> (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979).

The plaintiff claims that he will suffer irreparable injury because if KFC terminates his franchises and notifies his suppliers of the termination, he will be put out of business. Further, he claims, if he is forced out of business for a significant period of time, he will lose goodwill. Finally, he argues that obviously if he is shut down he will not earn any revenues and will therefore be unable to meet his fixed expenses.

With respect to the second prong of the standard, the plaintiff maintains that he has a strong likelihood of success on the merits. Moreover, he argues, the balance of hardships tips in his favor since, although termination of his outlet would put him out of business, KFC would suffer no injury at all if he is permitted to continue to operate his outlets.

Because our findings differ as to each store, we will discuss them separately.

### 1. The Elmsford Outlet

As we indicated above, the plaintiff claims that he will lose goodwill if his franchises are terminated, and indeed that he will be put out of business. It has been held that the loss of goodwill involving the termination of a franchise or distributorship can constitute the sort of irreparable harm which will justify the imposition of a preliminary injunction. *See, e.g., Jacobson & Co., Inc. v. Armstrong Cork Co.*, 548 F.2d 438 (2d Cir.1977) (movant who had been in business for over eight years, and

who stood to lose goodwill and present and potential customers if he lost the right to distribute the defendant's products, showed an immeasurable harm not compensable in money). The loss or destruction of an entire business has also widely been held to constitute irreparable harm, at least when the business has been in operation for some time. *E.g., Roso–Lino Beverage Distributors, Inc. v. The Coca–Cola Bottling Co.*, 749 F.2d 124 (2d Cir.1984) (loss of a distributorship representing eleven years of effort by a wife and husband constituted irreparable harm); *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir.1970) (right to continue a twenty-year old business not measurable entirely in monetary terms); *Newport Tire & Rubber Co. v. The Tire & Battery Corp.*, 504 F.Supp. 143 (E.D.N.Y.1980) (reviewing Second Circuit authorities).

We note that the cases indicated above concern businesses of several years' standing. In contrast, the Elmsford outlet has operated only since the end of August 1987, or less than eight months before this suit was commenced. Given this relatively short period of time, we do not believe that the loss of the Elmsford franchise would cause irreparable harm, and we hold that it does not.

Moreover, even if the plaintiff is not able to operate his restaurant as a Kentucky Fried Chicken outlet, it does not appear that he would be unable to operate it as a fried chicken restaurant under a different name (unless the non-competition provision is enforced). If this is correct, then indeed it could not be claimed that the plaintiff is faced with the destruction of his business, but only with its disruption while KFC trademarks are removed. The Second Circuit has intimated that a disruption in business does not constitute irreparable harm. *See Jack Kahn Music Co. v. Baldwin Piano & Organ Co.*, 604 F.2d 755 (2d Cir. 1979); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70 (2d Cir.1979). We are aware that in KFC's motion for a preliminary injunction, KFC seeks to enforce that provision of the Termination Agreement by which the plaintiff agreed not to

compete with KFC within a ten-mile radius of its outlets. This fact does not change our conclusion since we are not prepared to issue an injunction mandating the plaintiff's compliance with that provision. Indeed, since the plaintiff has operated the Elmsford outlet for such a limited time, it may be that the non-competition provision is unenforceable with respect to the Elmsford location, a point which we certainly do not decide here.

At oral argument, the plaintiff suggested that if his Kentucky Fried Chicken franchises were terminated, his suppliers would discontinue doing business with him, and that he therefore would be unable to operate a fried chicken restaurant under a different name. We cannot see why this would be so, and the plaintiff has offered no support for his contention. We therefore do not believe his contention should dissuade us from our denial of a preliminary injunction.

The finding of irreparable harm is a *sine qua non* to the granting of a preliminary injunction. Therefore, having found that the plaintiff would not suffer irreparable harm by the termination of the Elmsford franchise, we need not address the other elements of the preliminary injunction standard.

### 2. The White Plains Outlet

Because we grant KFC's motion for summary judgment with respect to the White Plains franchise, the plaintiff's motion for a preliminary injunction as to that franchise is denied as moot. Obviously, the findings on that motion establish that plaintiff does not have a likelihood of success.

SO ORDERED.