780 F.Supp. 885 (1991)
METROPOLITAN PROPERTY AND CASUALTY INSURANCE COMPANY
v.
J.C. PENNEY CASUALTY INSURANCE COMPANY and Daniel J. McNamara.
Civ. No. 2:91CV00381(AHN).
United States District Court, D. Connecticut, Hartford Division.
December 4, 1991.
*886 *887 Jeffrey L. Williams, Hebb & Gitlin, Hartford, Conn., for plaintiff.
Kenneth W. Williams, John E. Tenner, Robinson & Cole, Charles L. Howard, Shipman & Goodwin, Hartford, Conn., Mary G. Tacher, J.C. Penney Legal Dept., Dallas, Tex., for defendants.

RULING ON MOTION TO REMAND
NEVAS, District Judge.
In this action for injunctive relief, Metropolitan Property and Casualty Insurance Company ("Met") seeks to disqualify Daniel J. McNamara ("McNamara"), from serving as J.C. Penney Casualty Insurance Company's ("Penney") party-appointed member of a tripartite arbitration panel charged with arbitrating a dispute between Met and Penney. Specifically, Met seeks injunctive relief to (1) require Penney to remove McNamara as an arbitrator; (2) require McNamara to withdraw as an arbitrator; and (3) prohibit McNamara from serving as an arbitrator in this dispute. The action arises from Met's claim that McNamara committed arbitrator misconduct and exhibited evident partiality toward Penney prior to arbitrating a dispute between Met and Penney pursuant to a tripartite arbitration agreement.
Met files this motion to remand the case following removal from state court. Penney opposes the motion to remand. For the reasons below, the court grants Met's motion to remand.

I. Facts and Procedural History

On a motion to remand, the court construes all factual allegations in favor of the party seeking the remand. R.G. Barry Corp. v. Mushroom Makers, Inc., 612 F.2d 651, 655 (2d Cir.1979); Truglia v. KFC Corp., 692 F.Supp. 271, 275, (S.D.N.Y. 1988), aff'd, 875 F.2d 308 (2d Cir.1989); see also Cabalceta v. Standard Fruit Co., 883 F.2d 1553, 1561 (11th Cir.1989); Laughlin v. Prudential Ins. Co., 882 F.2d 187, 190 (5th Cir.1989). Accordingly, the relevant facts in this action are these.
On June 27, 1989 Met entered into a Master Agreement with Penney to purchase Penney's property and casualty insurance business for the price of $44 million. Pursuant to the Master Agreement, the parties entered into a Quota Share Reinsurance Agreement (the "Reinsurance Agreement") wherein Met agreed to reinsure several of Penney's other insurance sectors for which reserves were carried on Penney's books as of June 30, 1989. As partial consideration for the Reinsurance Agreement, Penney agreed to release and transfer to Met certain loss reserves associated with the reinsured policies. The parties also agreed that the loss reserves as of June 30, 1989 would be established according to prudent reserving customs and practices traditionally applied by Penney.
A dispute arose between Met and Penney concerning whether the loss reserves transferred to Met were established in accordance with the agreements. The Master Agreement contained a clause requiring the parties to submit to arbitration any dispute "which is not settled by mutual agreement." (Compl.Ex.A, at 50). The Master Agreement provided for a tripartite arbitration process whereby each party would select its own arbitrator and those two arbitrators, in turn, would select jointly a third member to the arbitration panel. Id. The Master Agreement also contained a clause specifying that the arbitration was to take place in Hartford, Connecticut and a choice of law clause in which Delaware law was to govern. Id. at 50-52.
On February 19, 1991, Met made a demand for arbitration regarding a dispute over the reinsurance reserves and requested that Penney name an arbitrator in accordance with the Master Agreement. On March 6, 1991, Penney notified Met of its selection of McNamara to serve as its party-appointed arbitrator on the panel.
Following McNamara's selection, Met learned that McNamara had engaged in ex *888 parte meetings and discussions with Penney at its Dallas headquarters concerning the merits of it claims in the arbitration prior to his formal selection to the panel, accepted "hospitality" from Penney during those meetings, evaluated documentary evidence relevant to the arbitration proceeding prior to his selection as an arbitrator, attempted to discuss the merits of the case with Met's appointed arbitrator before the third arbitrator had been selected, and failed to reveal his ex parte activities to Met.
On April 15, 1991, in Connecticut Superior Court, Met filed an action seeking to disqualify McNamara on the grounds of arbitrator misconduct and evident partiality naming Penney and McNamara as defendants. On May 1, 1991, Penney filed a petition for removal pursuant to 28 U.S.C. § 1441(b). On May 6, 1991, Met filed this motion to remand. In response, McNamara and Penney filed motions to dismiss on May 17, 1991. In addition, on May 17, 1991, Penney filed a separate action in this court seeking to compel arbitration.

II. Discussion

Met seeks to remand this case on the grounds that Penney's Verified Petition for Removal from Connecticut Superior Court (the "Petition") does not come within the jurisdictional requirements for removal under federal statute. Because the court finds that neither a federal question nor complete diversity of citizenship exists here to confer jurisdiction on the court pursuant to 28 U.S.C. § 1441(b), the court remands this action to Connecticut Superior Court for further proceedings.

A. Jurisdictional Requirements for Removal
Section 1441(b) provides for the removal of a case from state to federal court in actions where (1) "the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States ..." or (2) "none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." 28 U.S.C. § 1441(b).
At the outset, the court notes, and the parties agree, that the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-14, does not confer original jurisdiction on a district court within the scope of 28 U.S.C. § 1331. Moses H. Cohen Memorial Hosp. v. Mercury Const. Corp., 460 U.S. 1, 25 n. 32, 103 S.Ct. 927, 942 n. 32, 74 L.Ed.2d 765 (1983). Removal jurisdiction, moreover, cannot "be predicated upon the fact that [a] petition asserts rights under the Federal Arbitration Act." Drexel Burnham Lambert, Inc. v. Valenzuela Bock, 696 F.Supp. 957, 959 (S.D.N.Y.1988). Because the FAA is insufficient to confer removal jurisdiction under § 1441(b) and no other independent basis for federal jurisdiction has been asserted here, there "must be diversity of citizenship ... before [removal] can issue." Moses Cohen, 460 U.S. at 25 n. 32, 103 S.Ct. at 942 n. 32.
Accordingly, Penney can only remove this case to federal court if the parties satisfy the diversity of citizenship requirement of § 1441(b). In determining whether there is requisite diversity of citizenship here, the issue is whether McNamara is a party in interest properly joined and served as a defendant. If McNamara, who is a citizen of Connecticut, is a properly joined defendant, then diversity jurisdiction is defeated and the case must be remanded.

B. The Fraudulent Joinder Standard
The joinder of a defendant who resides in the state where the action is brought will not destroy diversity where the defendant is a "nominal" party "with no real, or direct interest in the controversy." Saxe, Bacon & Bolan, P.C. v. Martindale-Hubbell, 521 F.Supp. 1046, 1047 (S.D.N.Y.1981), aff'd, 710 F.2d 87 (2d Cir. 1983), citing Salem Trust Co. v. Mfr's Finance Co., 264 U.S. 182, 189-190, 44 S.Ct. 266, 267-268, 68 L.Ed. 628 (1924). The citizenship of a defendant, however, "who is a proper, even though not an indispensable, party must be considered when determining the existence of diversity." Dailey v. Elicker, 447 F.Supp. 436, 438 (D.Col. *889 1978), citing Oppenheim v. Sterling, 368 F.2d 516 (10th Cir.1966), cert. denied, 386 U.S. 1011, 87 S.Ct. 1357, 18 L.Ed.2d 441 (1967); 13 Wright, Miller & Cooper, Federal Practice and Procedure § 3606, at 626-628 (1975) ("Wright & Miller").
A defendant is nominal and his citizenship may be disregarded "if no cause of action or claim for relief is or could be stated against him ..." Martindale-Hubbell, 521 F.Supp. at 1048; see also Truglia, 692 F.Supp. at 274-275; Dailey, 447 F.Supp. at 438. The removing party bears the burden of establishing federal jurisdiction and "proving the nominal nature of the non-diverse party ..." Martindale-Hubbell, 521 F.Supp. at 1048; see also Cabalceta, 883 F.2d at 1561; Laughlin, 882 F.2d at 190; Mushroom Makers, 612 F.2d at 655; Truglia, 692 F.Supp. at 275; Dailey, 447 F.Supp. at 438. In determining whether the party seeking removal has met its burden, moreover, the court looks to the governing substantive law under which the right asserted by the plaintiff is to be enforced.[1]See Iowa Pub. Serv. Co. v. Medicine Bowl Coal Co., 556 F.2d 400, 404 (8th Cir.1977); Quinn v. Post, 262 F.Supp. 598 (S.D.N.Y.1967); see also Truglia, 692 F.Supp. at 275.
To sustain its burden, "defendant must show with specificity that the facts as stated in the complaint, [under the governing law], form no basis for [relief] against the defendant who defeats diversity." Truglia, 692 F.Supp. at 275. The court resolves all disputed facts and any uncertainties or doubts about the state of the controlling substantive law in favor of the party seeking remand. Id.; see also Cabalceta, 883 F.2d at 1561; Laughlin, 882 F.2d at 190; American Mut. Liability Ins. Co. v. Flintkote Co., 565 F.Supp. 843, 845 (S.D.N.Y. 1983); Martindale-Hubbell, 521 F.Supp. at 1048.
The test for fraudulent joinder in a removal context has been summarized as follows:
[a] joinder may be fraudulent and sham if the allegations in the plaintiff['s] pleading with reference to the resident defendants are shown to be so clearly false and fictitious that no factual basis exists for an honest belief on the part of plaintiff that there is liability  in short that the joinder is without any reasonable basis in fact and is made without any purpose to prosecute the cause in good faith ...
Quinn, 262 F.Supp. at 603. Thus, the "stringent test for fraudulent joinder" requires that if "there is any reasonable basis for predicting that [the controlling] law might" grant Met the relief it seeks against McNamara, the non-diverse defendant, the court will not disregard him as a nominal defendant and the case must be remanded. American Mutual, 565 F.Supp. at 845 (emphasis added); see also Laughlin, 882 F.2d at 190 (a defendant is "nominal" for purposes of determining diversity in a motion to remand "only if [the court] concludes that the plaintiff has no possibility of establishing a valid cause of *890 action against the in-state defendant") (emphasis added), citing B., Inc. v. Miller Brewing Co., 663 F.2d 545 (5th Cir.1981); Bobby Jones Garden Apartments v. Suleski, 391 F.2d 172 (5th Cir.1968); Parks v. New York Times, Co., 308 F.2d 474 (5th Cir.1981), cert. denied, 376 U.S. 949, 84 S.Ct. 964, 11 L.Ed.2d 969 (1964).

C. Application of the Fraudulent Joinder Standard
At issue here is whether Met's action for injunctive relief provides any possible basis for establishing a valid cause of action against McNamara, the "in-state defendant." Met's allegations of arbitrator misconduct must be evaluated in the context of the parties agreement to arbitrate their dispute under something akin to a tripartite arbitration process.[2] Met contends that its factual allegations of misconduct are sufficient to establish a cause of action against McNamara in that context. Met asserts, moreover, that neither Penney nor McNamara have met their burdens of establishing the fraudulent joinder of McNamara as a nominal party to this action. The court agrees.
Met alleges that McNamara engaged in the following conduct with Penney: (1) he travelled to Dallas, prior to being selected as an arbitrator by Penney, where he engaged in ex parte meetings with Penney officials about the pending arbitration, discussed the merits of Penney's case, and accepted "hospitality" from Penney without giving notice to Met; (2) he received documentary evidence from Penney regarding "material facts of the dispute" prior to being selected to the panel and without giving notice to Met; (3) he attempted to discuss the substance of these ex parte communications with the arbitrator named by Met prior to the selection of the third "neutral" arbitrator; and (4) he engaged in deliberations and considered material evidence received from Penney prior to the selection of the full arbitration panel. (Compl. ¶ 16). Met claims that this conduct constitutes "arbitrator misconduct" within the context of the tripartite arbitration process delineated in the agreement. (Compl. ¶ 17.)
Section 10 of the FAA provides relief from arbitration procedures in which the bias or misconduct of an arbitrator is called into question. Specifically, Section 10 provides for the vacating of an arbitration award "[w]here there was evident partiality or corruption in the arbitrators, or either of them." 9 U.S.C. § 10(b). In determining the legal standard of evident partiality or corruption, the United States Supreme Court noted that the American Arbitration Association's Rule on disclosure of impartiality or bias "rest[s] on the premise that any tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the appearance of bias." Commonwealth Coatings Corp. v. Continental Casualty Co., 393 U.S. 145, 150, 89 S.Ct. 337, 340, 21 L.Ed.2d 301 (1968). In interpreting the scope of Section 10(b) of the FAA the Court stated that it was not the "purpose of Congress to authorize litigants to submit their cases and controversies to arbitration boards that might reasonably be thought biased against one litigant and favorable to another." Commonwealth Coatings, 393 U.S. *891 at 150, 89 S.Ct. at 340. Indeed, the plurality in Commonwealth Coatings even analogized the ethical standards of arbitrators to those of federal judges and construed Section 10 as requiring arbitrators to avoid "even the appearance of bias." Id.
Recently, several courts of appeals have adopted a more narrow reading of Section 10 that mirrors the reasoning of Justice White's concurrence in Commonwealth Coatings. See id. at 150-151, 89 S.Ct. at 340 (White, J., concurring). Those cases hold that the mere appearance of impartiality, alone, is insufficient to establish arbitrator bias or impropriety under Section 10. Rather, the party alleging such impropriety must establish facts that create a reasonable impression of bias or misconduct. Morelite Constr. Corp. v. N.Y.C. Dist. Council Carpenters, 748 F.2d 79, 83-84 (2d Cir.1984); see also Apperson v. Fleet Carrier Corp., 879 F.2d 1344, 1353 (6th Cir.1989), cert. denied, ___ U.S. ___, 110 S.Ct. 2206, 109 L.Ed.2d 533 (1990); Toyota of Berkeley v. Local 1095, 834 F.2d 751, 755 (9th Cir.1987), cert. denied, 486 U.S. 1043, 108 S.Ct. 2036, 100 L.Ed.2d 620 (1988); Sheet Metal Workers Int'l Ass'n Local 420 v. Kinney Air Conditioning Co., 756 F.2d 742, 745-746 (9th Cir.1985); Merit Ins. Co. v. Leatherby Ins. Co., 714 F.2d 673, 681-682 (7th Cir.1983), cert. denied, 464 U.S. 1009, 104 S.Ct. 529, 78 L.Ed.2d 711 (1983).
Merely applying this standard of evident partiality to Met's allegations, however, does not end the inquiry. The FAA "does not confer a right to compel arbitration of any dispute at any time; it confers only the right to obtain an order directing that `arbitration proceed in the manner provided for in [the parties] agreement.'" Volt Information Sciences v. Bd. of Trustees, 489 U.S. 468, 474-475, 109 S.Ct. 1248, 1253, 103 L.Ed.2d 488 (1989) (emphasis original). There is, moreover, "no federal policy favoring arbitration under a certain set of procedural rules; the federal policy is simply to ensure the enforceability, according to their terms, of private agreements to arbitrate." Id. at 476, 109 S.Ct. at 1254. In short, while helpful in determining the general legal standard for alleging facts that establish arbitrator impropriety, the FAA does not preempt the specific procedures contained in the private agreement.
Here, the parties have agreed to a form of tripartite arbitration and have specified certain procedural rules. Each party agreed to select its own arbitrator within a specified time period. The two party-appointed arbitrators, in turn, proceed to select a "third" arbitrator. (Compl.Ex. A. at 50.) Once the panel is in place, the parties submit their briefs and replies within the specified time period. Id. at 50-51. Thus, the court must determine whether Met's allegations provide a reasonable basis for finding evident partiality and arbitrator misconduct in the context of the agreement to arbitrate under this particular tripartite procedure. See Astoria Medical Group v. Health Ins. Plan of Greater N.Y., 11 N.Y.2d 128, 227 N.Y.S.2d 401, 403-404, 182 N.E.2d 85, 87 (N.Y.Ct.App.1962) (court must look to the private agreement of the parties in disqualifying a member of an arbitration panel for bias).
Although only scant case law exists on the subject of arbitrator bias in the tripartite context, "there has grown a common acceptance of the fact that the party-designated arbitrators are not and cannot be `neutral', [sic] at least in the sense that the third arbitrator or a judge is." Astoria Medical Group, 227 N.Y.S.2d at 403-404, 182 N.E.2d at 87; see also, Society for Good Will to Retarded Children, Inc. v. Carey, 466 F.Supp. 722, 728 (E.D.N.Y. 1979); Aetna Casualty and Surety Co. v. Grabbert, 590 A.2d 88, 92-93 (R.I.1991). The Code of Ethics for Arbitrators in Commercial Disputes ("Code of Ethics") provides additional guidance on the issue of arbitrator neutrality in the tripartite context:
[i]n all arbitrations in which there are two or more party-appointed arbitrators, it is important for everyone concerned to know from the start whether the party appointed arbitrators are expected to be neutrals or non-neutrals. In such arbitrations, the two party-appointed arbitrators *892 should be considered non-neutrals unless both parties inform the arbitrators that all three arbitrators are to be neutral, or, unless the contract, the applicable arbitration rules, or any governing law requires that all three arbitrators are to be neutral.
In tripartite arbitration, therefore, "each party's arbitrator `is not individually expected to be neutral.'" Carey, 466 F.Supp. at 728, quoting Astoria Medical Group, 227 N.Y.S.2d at 403-404, 182 N.E.2d at 87.
The fact that party selected arbitrators are not expected to be "neutral", however, does not mean that such arbitrators are excused from their ethical duties and the obligation to participate in the arbitration process in a fair, honest and good-faith manner. See Grabbert, 590 A.2d at 93-94; Astoria Medical Group, 227 N.Y.S.2d at 406-407, 182 N.E.2d at 89. The New York Court of Appeals expounded on the ethical obligations of party-appointed arbitrator stating:
Partisan he may be, but not dishonest. Like all arbitrators, the arbitrator selected by a party must (unless the requirement is waived) take the prescribed oath that he will `faithfully and fairly ... hear and examine the matters in controversy and ... make a just award according to the best of [his] understanding.' And, if either one of the party-appointed arbitrators fails to act in accordance with such oath, the award may be attacked on the ground that it is the product of `evident partiality or corruption.' Such an attack, however, must be based on something overt, some misconduct on the part of an arbitrator, and not simply on his interest in the subject matter of the controversy or his relationship to the party who selected him.
Astoria Medical Group, 227 N.Y.S.2d at 407, 182 N.E.2d at 89 (emphasis added) (citations omitted).
New York, moreover, is not the only jurisdiction that requires party-appointed arbitrators to act in a fair and ethical manner. Delaware law provides expressly for an attack on a party-appointed arbitrator where there was "corruption in any of the arbitrators or misconduct prejudicing the rights of any party." Del.Code Ann. tit. 10 § 5714(a)(2).[3]
The Rhode Island Supreme Court, relying on the Code of Ethics for Arbitrators in Commercial Disputes held that although "a party-appointed arbitrator may be predisposed toward the arbitrator's appointor ... this allowance does not relieve a party-appointed arbitrator of the ethical obligation to act in good faith and with integrity and fairness." Grabbert, 590 A.2d at 94. Similarly, the New Jersey Supreme Court stated:
[w]hile a party-designated arbitrator may approach the arbitration proceedings with some sympathy for the position of the party designating him, such an arbitrator must remain faithful to the obligation which rests upon him to maintain `broad public confidence in the integrity and fairness of the process.' * * * Thus, all arbitrators should `conduct the proceedings in an evenhanded manner and treat all parties with equality and fairness at all stages of the proceedings.' *893 * * * Most important, arbitrators `should decide all matters justly, exercising independent judgment, and should not permit outside pressure to affect the decision.'
Barcon Assoc., Inc. v. Tri County Asphalt Corp., 86 N.J. 179, 190-191, 430 A.2d 214 (1981). Thus, even a party-appointed arbitrator in the tripartite context "has a responsibility not only to the parties but also to the process itself, and must observe high standards of conduct so that the integrity and fairness of the process will be preserved." Canon I, Code of Ethics, quoted in, Grabbert, 590 A.2d at 94; see also Florasynth, Inc. v. Pickholz, 750 F.2d 171, 173 (2d Cir.1984) (inference of tripartite arbitration process was that party selected arbitrators "were not to act merely as partisan advocates" but were to act as one board and all three members have a responsibility to be disinterested).
Here, Met has alleged more than impartiality based on McNamara's nominal or institutional relationship with Penney, the party that selected him. Rather Met alleges that McNamara engaged in the type of overt misconduct with Penney; which if proven, calls into question his ability to carry out his oath and ethical obligations as an arbitrator. McNamara's alleged ex parte meetings with Penney at its Dallas headquarters to discuss the merits of Penney's defenses and to examine potential documentary evidence in the case prior to his selection as a member of the panel, as well as his efforts to discuss the case with the other party-appointed arbitrator prior to the selection of the third arbitrator, could be interpreted as inconsistent with the Code of Ethics and his duty to treat the parties fairly at all stages of the proceedings, exercise independent judgment throughout, and remain free from outside pressures.
The alleged conduct, moreover, runs counter to the procedure set forth in the Master Agreement in which the parties were to submit their cases only after the panel was in place. (See Compl. Ex. A at 50-51). Indeed, that agreement contains no provisions whatsoever that could be construed as even remotely sanctioning the type of ex parte activity alleged here. See generally Corporate Printing Co. v. N.Y. Typographical Union No. 6, 601 F.Supp. 323, 327 (D.C.N.Y.1984).
Finally, McNamara's alleged failure to reveal these ex parte activities to Met violates the rule that an arbitrator must disclose at the time of his appointment "`any circumstances likely to create a presumption of bias or which he believes might disqualify him as an impartial Arbitrator.'" Commonwealth Coatings Corp., 393 U.S. at 149, 89 S.Ct. at 339, quoting § 18 of the Rules of the American Arbitration Association; see also Carey, 466 F.Supp. at 728. In light of these allegations and the absence of any contrary legal authority, Met's complaint provides a reasonable basis for which to sustain a claim of evident partiality and arbitrator misconduct.
Both Penney and McNamara contend that even if the court rules that Met has stated a claim for evident partiality or arbitrator misconduct here, Met cannot legally enjoin McNamara from participating in the arbitration. Penney contends as a matter of law and policy that Met is prohibited from seeking an injunction to disqualify an arbitrator prior to the completion of the arbitration. Penney asserts that Met's only legal remedy for the alleged misconduct here is to vacate the final arbitration award. Because it contends that Met is precluded as a matter of law from seeking injunctive relief against McNamara, Penney concludes that the in-state defendant in this action is an improper and thus, "nominal", party in this action. The Court disagrees.
First, Penney's assertion that the enjoining of McNamara conflicts with the overriding policy objective of arbitration law "to permit a just and expeditious result with a minimum of judicial interference" is without merit in this context. Admittedly, it is theoretically possible that the granting of injunctive relief against McNamara "might spawn endless applications and indefinite delay" by encouraging Met to challenge Penney's selection to the panel repeatedly. Marc Rich & Co. v. Transmarine Seaways Corp., 443 F.Supp. 386, 388 *894 (S.D.N.Y.1978). However, it is more likely, indeed a virtual certainty, that Met will seek to vacate any award, short of total victory, that McNamara participates in once the arbitration concludes. Thus, Met will litigate the propriety of McNamara's conduct after the arbitration even if it is precluded from disqualifying him prior to the process.
In light of this reality, it simply does not follow that the policy objective of an expeditious and just arbitration with minimal judicial interference is furthered by categorically prohibiting a court from disqualifying an arbitrator prior to arbitration. See Astoria Medical Group, 227 N.Y.S.2d at 402-404, 182 N.E.2d at 86-87; Gaer Brothers, Inc. v. Mott, 144 Conn. 303, 309, 130 A.2d 804 (1957). Here, the parties will not only suffer the delay produced by litigation seeking to vacate the award after arbitration, but risk the additional loss of time and money if the court finds in Met's favor. Should Penney prevail on the merits of its claim and the court follow Penney's approach of granting relief only after arbitration concludes, Met would be entitled to vacate the award and the parties will then have to go through the entire arbitration process all over again before a different arbitration panel. See e.g. 9 U.S.C. § 10; 10 Del.C.A. § 5714(c).
Under these circumstances, it seems senseless to require both parties to "submit to a prolonged, costly proceeding ... [when] this unfair burden can readily be avoided upon proof, in this action of bias and collusion." Gaer, 144 Conn. at 309, 130 A.2d 804. The "just" and "expeditious" policy, therefore, would be to evaluate Met's claims on the merits of its action for injunctive relief prior to arbitration rather than have the parties waste their time, energy, and money by participating in a potentially tainted process.
Second, Penney's reliance on various Second Circuit cases in support of its contention that courts cannot enjoin an arbitrator prior to the completion of arbitration is not persuasive in this case.[4]See Florasynth, Inc. v. Pickholz, 750 F.2d 171 (2d Cir.1984); Michaels v. Mariforum Shipping, S.A., 624 F.2d 411 (2d Cir.1980); Corporate *895 Printing Co., Inc. v. N.Y. Typographical Union No. 6, 601 F.Supp. 323 (S.D.N.Y. 1984); Marc Rich & Co. v. Transmarine Seaways Corp. of Monrovia, 443 F.Supp. 386 (S.D.N.Y.1978). Those cases are distinguishable in significant respects.
Penney cites Florasynth for the proposition that the decision as to whether to disqualify an arbitrator "is better left to the discretion of the individual arbitrator." Florasynth, 750 F.2d at 174. Florasynth, however, dealt with judicial review of an arbitrators right to resign prior to the completion of the arbitration process. The Court's conclusion that the FAA "does not provide for judicial scrutiny of an arbitrator's qualifications to serve, other than in a proceeding to confirm or vacate an award," was made in the context of a finding that there is no basis "statutory or otherwise ... that grants courts the power to force unwilling arbitrators to serve." Id. Here, Met does not seek to force McNamara to serve as an arbitrator. To the contrary, it seeks to disqualify him.
Similarly, Michaels holding that a district court should dismiss any "interlocutory" attacks on an arbitration process is inapposite to the dispute here. Michaels involved a court's power to review an interlocutory award in an arbitration process that had been ongoing for over two years. Michaels, 624 F.2d at 415. Michaels concern over the undue delays that would be caused by judicial review of "intermediary arbitration decisions involving procedure or any other interlocutory matter" is persuasive only to the extent that courts should not entertain interlocutory arbitration appeals. Here, Met raises no interlocutory appeal arising out of the arbitration proceedings but seeks to disqualify an arbitrator for misconduct prior to the beginning of that process.
Finally, the holdings in Marc Rich and Corporate Printing that a district court lacks jurisdiction to pass on the qualifications of an arbitrator are not conclusive in the context of this action. Those cases involved disputes over the "qualifications" and "institutional bias" of arbitrators that created "at least the appearance of bias." Marc Rich, 443 F.Supp. at 387; Corporate Printing, 601 F.Supp. at 323. Met does not attack the qualifications of McNamara nor any potential conflict of interest created by his past institutional relationships with Penney. Nor does Met allege the "appearance of bias" here. Rather, Met alleges overt arbitrator misconduct and impropriety during the arbitrator selection process, misconduct that neither the Marc Rich nor Corporate Printing courts contemplate in their holdings.
Third, contrary to Penney's contention, the court has located several sources which permit a court to enjoin an arbitrator in the tripartite context. In Astoria Medical Group, a case involving a dispute over the impartiality of a party-appointed arbitrator to a tripartite arbitration panel, the New York Court of Appeals, a jurisdiction well versed on the subtleties and complexities of arbitration law, stated: "we are persuaded that, in an appropriate case, the courts have inherent power to disqualify an arbitrator before an award has been rendered." Astoria Medical Group, 227 N.Y.S.2d at 402, 182 N.E.2d at 86.[5] Significantly, the Second Circuit has noted "that the federal act is modeled substantially" on New York's arbitration law. See Florasynth, 750 F.2d at 175.
Gaer, a Connecticut Supreme Court ruling provides the court with additional guidance on this issue. Although Gaer, involved an arbitration agreement that specified the particular arbitrators whom the *896 plaintiff sought to disqualify, a distinction that Penney argues is significant, see Marc Rich, 443 F.Supp. at 388, the court, nonetheless, finds the simple logic behind the Gaer ruling compelling:
[w]hen there is no adequate remedy at law, the party claiming injury through partiality and fraud can invoke the equitable powers of a court for an appropriate remedy. The statutes relating to arbitration afford no remedy for partiality or collusion of the arbitrators until after an award has been made ... If courts can set aside an award for the partiality and collusion of arbitrators, they should have the power to interrupt proceedings when, in a plenary action before an award, one of the parties can prove partiality and collusion in the arbitration proceedings.
Gaer, 144 Conn. at 309, 130 A.2d 804.
While these cases are not dispositive of a court's power to disqualify an arbitrator in all arbitration disputes, the court finds them persuasive in the context of allegations of overt arbitrator misconduct. Although the law is unsettled on the appropriateness of injunctive relief in all arbitration situations, the court is not prepared to rule as a matter of law that Met cannot enjoin McNamara here.
In short, Penney has simply failed to sustain its burden of convincing the court that the injunctive relief Met seeks is precluded categorically as a matter of law and that there is no reasonable basis upon which Met can prevail in this action. While Penney's contention is not without support, it can offer no direct authority, either statutory or case law, federal or state, that categorically prohibits a court from disqualifying McNamara based upon the nature of the alleged misconduct in this case. At best, Penney's argument raises uncertainties about the state of controlling law on this issue. In evaluating Met's motion to remand, however, the court resolves all disputed facts and any uncertainties or doubts about the state of the controlling substantive law in favor of the party seeking remand. Truglia, 692 F.Supp. at 275; see also Cabalceta, 883 F.2d at 1561; Laughlin, 882 F.2d at 190; American Mutual, 565 F.Supp. at 845; Martindale-Hubbell, 521 F.Supp. at 1048.
It may well be that after a thorough evaluation on the merits at trial, a court may decide that an injunction is simply unwarranted here. In light of the available legal authorities on the issue, however, the court is persuaded that Met's claim against McNamara, the in-state defendant in this action, is sufficient to make him more than a "nominal party" to this dispute.[6] Accordingly, the court lacks jurisdiction to hear this case on removal and the case must be remanded to state court.

CONCLUSION
For the reasons stated above, the court grants the motion to remand and orders the case remanded to Connecticut state court.
SO ORDERED.
NOTES
[1] The parties disagree as to what law controls here. Met contends that Connecticut law, the law of the forum selected by parties in which to arbitrate their dispute, governs the procedural aspects of this arbitration under the principle of lex fori, and thus is the controlling law for the purposes of its action to enjoin the arbitration. Conversely, Penney and McNamara contend that federal law pursuant to the FAA governs. The court notes, moreover, that the Master Agreement contains a choice of law clause in which "[t]his agreement shall be construed and enforced in accordance with Delaware Law, without giving effect to the principles of conflicts of law thereof." (Compl., Ex. A. at 52).

Because the parties provided no dispositive legal authority from any one of these three jurisdictions on the specific issue presented in this case, the court was forced to turn to a hybrid of case and statutory law for guidance in evaluating the relative merits of the parties' arguments. Where the parties employ an authority from a particular jurisdiction in support of their position, however, the court attempts to evaluate that authority as being from an applicable jurisdiction unless otherwise noted. In making this effort to consider the arguments of the parties on the substantive merits wherever possible, the court is satisfied that its ruling on the motion to remand would be the same under federal, Delaware, or Connecticut law. Accordingly, the choice of law issue presented in this case, although formidable, is not dispositive of the motion to remand and is more appropriately resolved, if necessary, by the Connecticut state court.
[2] The arbitration agreement provides in relevant part:

(b) Within twenty days (20) from the receipt of notice from one party that an arbitrator has been appointed, the other party shall also name an arbitrator. The two arbitrators shall choose a third arbitrator and shall forthwith notify the contracting parties of such choice ... Each arbitrator shall be a present or former property and casualty insurance company officer who is otherwise not directly or indirectly affiliated with any party to this agreement.
(c) The party requesting arbitration (the "Petitioner") shall submit its brief to the arbitrators within thirty (30) days after notice of the selection of the third arbitrator. Upon receipt of the petitioner's brief, the other party (the "Respondent") shall have thirty (30) days to file a reply brief. On receipt of the Respondent's brief, the Petitioner shall have twenty (20) days to file it rebuttal brief. Respondent shall have twenty (20) days from the receipt of the Petitioner's rebuttal brief to file its rebuttal brief. The arbitrators may extend the time for filing of a brief at the request of either party.
(Compl.Ex. A at 50-51.)
[3] Counsel for Penney misrepresented that under Section 5714 of the Delaware Arbitration Act a party may not challenge the impartiality of a party appointed arbitrator at any time since under the Delaware Act an award may be vacated for arbitrator bias only if the "neutral" or, "third" arbitrator shows evident partiality. This is simply not the case. Section 5714 states in relevant part:

(a) Upon complaint or application of a party in an existing case, the Court shall vacate an award where:
* * * * * *
(2) There was evident partiality by an arbitrator appointed as a neutral except where the award was by confession, or corruption in any of the arbitrators or misconduct prejudicing the rights of any party;
* * * * * *
Del.Code Ann. tit. 10 § 5714. If this action involved only a claim of institutional bias or an allegation of a prior business relationship between Penney and its arbitrator, counsels' representation would be understandable. Here, however, Met alleges specific and overt arbitrator misconduct of a party-appointed arbitrator concerning the actual arbitration process, allegations, which if proven, are covered by the plain language of Section 5714.
[4] Penney also refers to Anadarko Petroleum Corp. v. Panhandle Eastern Corp., (Del.Ch. Sept. 21, 1987) (1987 WL 17445) (Deft.'s Mem.Opp. Mot. to Remand, Ex. B., at 1 ("Anadarko")), a Delaware case that follows Marc Rich in its holding that under federal law a court has no power to scrutinize the qualifications of an arbitrator and enjoin that arbitrator prior to the conclusion of arbitration. For the same reasons that the court finds Marc Rich unpersuasive, the court chooses not to follow Anadarko.

However, Penney takes Anadarko one step further, invoking it as proof that "Delaware follows this rule [prohibiting a party from enjoining arbitration prior to its conclusion] as well." (Deft.'s Mem.Opp.Mot. to Remand, at 13, n. 6). The Court disagrees with this conclusion about Delaware law.
First, Anadarko expressly states that "[t]he parties agree that the ... described [arbitration] procedure is governed by federal law." Anadarko, at 1. Thus, the Anadarko court's ruling was based exclusively on the application of federal law and is no way dispositive of Delaware law on the issue. The court notes, moreover, that Met and Penney vehemently disagree about whether federal or state law controls in this action.
Second, Anadarko was decided prior to the United States Supreme Court's ruling in Volt Information Sciences, which held that the FAA does not preempt governing state law on matters of arbitration procedures that do not conflict with the general purposes of the FAA. Volt Information Sciences, 489 U.S. at 477-478, 109 S.Ct. at 1254-1255. Thus, Anadarko cannot be read for the proposition that Delaware law has adopted nor is preempted automatically by the FAA in cases in which the parties have stipulated to a choice of state law.
Third, the Delaware Uniform Arbitration Act, Del.Code Ann. tit 10, § 5703, provides for courts to enjoin an arbitration in certain circumstances. § 5703 states in relevant part:
(b) Application to enjoin arbitration.  Subject to subsection (c) of this section, a party who has not participated in the arbitration and who has not been made or served with an application to compel arbitration may file its complaint with the Court seeking to enjoin arbitration on the ground that a valid agreement was not made or has not been complied with ...
Id. at § 5703(b).
The court notes that it is possible to construe the alleged misconduct between Penney and McNamara as a failure to comply with the procedure specified in the Arbitration Agreement in this case. Thus, § 5703 of the Delaware Arbitration Act is a far cry from Penney's contention at oral argument that the court is powerless as a matter of law to enjoin an arbitration under any circumstances of arbitrator misconduct or collusion.
[5] In his dissent in Astoria Medical Group, Chief Judge Desmond provides additional support for the view that a court has the equituable power to disqualify a party-appointed arbitrator prior to the beginning of the arbitration. Indeed, Chief Judge Desmond cited a line of cases in which New York courts have disqualified arbitrators "because of relationships to the parties or to the controversy, or because of `interest' much more remote than demonstrated here." Astoria Medical Group, 227 N.Y.S.2d at 409, 182 N.E.2d at 91 (Desmond, Chief J., dissenting). The dissent noted that ruling on the qualifications of an arbitrator prior to arbitration "is the time to pass on such a clause of ineligibility since if the party knowing the disqualifing facts as to his opponent's nominee nevertheless participates in an arbitration without applying for the nominee's removal his inaction will constitute a waiver." Id.
[6] McNamara and Penney briefly argue that McNamara is not a "party in interest" here because Met can obtain complete relief by simply seeking to enjoin Penney from using him as their party selected arbitrator. McNamara, however, need not be indispensable, but only a proper party to this action for the court to consider his citizenship in determining jurisdiction for removal. Dailey, 447 F.Supp at 438. The court, moreover, is bound by the rule that fraudulent joinder may be inferred only where the plaintiff could not conceivably recover from the in-state defendant. Laughlin, 882 F.2d at 190; Truglia, 692 F.Supp. at 275; American Mutual, 565 F.Supp. at 845; Martindale-Hubbell, 521 F.Supp. at 1048; Dailey, 447 F.Supp. at 438; Quinn, 262 F.Supp. at 603; see also Wilson v. Republic Iron & Steel Co., 257 U.S. 92, 42 S.Ct. 35, 66 L.Ed. 144 (1921).

McNamara's insistence that he has no real interest in this dispute is somewhat puzzling. If McNamara is not a party in interest in this dispute, as his counsel represented to the court at oral argument, the court would think that he would simply withdraw as Penney's appointed-arbitrator and thereby put an end to this potentially lengthy and costly litigation.